UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

ROBERT W. BETHEL,

       Plaintiff,                       Case No. 2:15-cv-3016

vs.

CHARLOTTE A. JENKINS, *et al*.,       District Judge Algenon L. Marbley
                                    Magistrate Judge Michael J. Newman

       Defendants.

_____

**ORDER AND ENTRY GRANTING: (1) *PRO SE* PLAINTIFF'S MOTION FOR LEAVE TO FILE AN AMENDED COMPLAINT (DOC. 70); AND (2) PLAINTIFF'S MOTION FOR LEAVE TO SUPPLEMENT THE SUMMARY JUDGMENT RECORD (DOC. 75).**

**\*\*\***

**REPORT AND RECOMMENDATION[1] THAT: (1) DEFENDANTS' MOTION FOR SUMMARY JUDGMENT (DOC. 68) BE GRANTED; (2) *PRO SE* PLAINTIFF'S CROSS MOTION FOR SUMMARY JUDGMENT (DOC. 67) BE DENIED; AND (3) THIS CASE BE TERMINATED ON THE COURT'S DOCKET.**

_____

This is a 42 U.S.C. § 1983 action filed by *pro se* Plaintiff on November 19, 2015.[2]  Doc. 1.

Plaintiff, Robert Bethel, is a death row inmate at the Chillicothe Correctional Institution ("CCI") in

Chillicothe, Ohio. *Id*.  He alleges that his constitutional rights were violated when four books were

withheld from him under a prison policy instituted, and later rescinded, by Defendants.  *Id*.  Named as

Defendants, in their individual and official capacities, are: former CCI Warden Charlotte Jenkins

("Warden Jenkins"); former CCI mailroom supervisor Lieutenant Michael Eiring ("Lt. Eiring"); and

current CCI Warden Timothy Shoop ("Warden Shoop").[3]  *Id*. at PageID 480.  As damages, Plaintiff

seeks $16.00 of postage for the four books actually withheld from him and $1.00 for each of the 205

---

[1] Attached hereto is a NOTICE to the parties regarding objections to this Report and Recommendation.

[2] This case is properly in U.S. District Court under 18 U.S.C. § 1331, which creates federal court subject matter jurisdiction for all § 1983 cases. *Atlantic Coast Line R.R. v. Eng'rs*, 398 US 281, 296 (1970).

[3]Plaintiff's motion for leave to file an amended complaint naming Timothy Shoop as an additional defendant to the action (doc. 70) is hereby **GRANTED** for good cause shown and because justice so requires. Fed. R. Civ. P. 15(a).

books, magazines, and newspapers allegedly unavailable to him as a result of the policy. Doc. 39 at PageID 485-86.

This case was before of the Western Division of this Court when Defendants filed a motion for Judgment on the Pleadings on January 1, 2016. Doc. 12 at PageID 143-57. The Magistrate Judge then assigned to this case granted Defendants' motion in a Report and Recommendation, which was adopted by the District Court Judge over Plaintiff's objections. Doc. 23, Doc. 31. Plaintiff appealed, and the Sixth Circuit reversed the District Court's decision in part, finding Plaintiff sufficiently alleged a First Amendment free speech and a Fourteenth Amendment due process claim. *Bethel v. Jenkins*, No. 16-4185, 2017 U.S. App. Lexis 22061, at *10-11 (6th Cir. Sept. 22, 2017). This case was then transferred to the undersigned. Doc 74. These two claims are the only claims at issue in this suit.

Now before the Court are the parties' cross-motions for summary judgment and subsequent opposition and reply memoranda. Docs. 67-69, 71-73. The undersigned has carefully considered all of the foregoing, as well as the appropriate Rule 56 evidence submitted in support thereof, and the parties' cross-motions for summary judgment are ripe for decision. Given his *pro se* status, all of Plaintiff's allegations, and his summary judgment pleadings, have been liberally construed in his favor. *Estelle v. Gamble,* 429 U.S. 97, 106 (1976).

## I.

A motion for summary judgment should be granted if the evidence submitted to the Court demonstrates there is no genuine issue as to any material fact and that the movant is entitled to summary judgment as a matter of law. Fed. R. Civ. P. 56; *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247-48 (1986). "Summary judgment is only appropriate 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'" *Keweenaw Bay Indian Comm. v. Rising*, 477 F.3d 881, 886 (6th Cir. 2007) (quoting Fed. R. Civ. P. 56(c)). "Weighing of the evidence or making

credibility determinations are prohibited at summary judgment -- rather, all facts must be viewed in the light most favorable to the non-moving party." *Id*.

Once "a motion for summary judgment is properly made and supported, an opposing party may not rely merely on allegations or denials in its own pleading[.]" *Viergutz v. Lucent Techs., Inc.*, 375 F. App'x 482, 485 (6th Cir. 2010) (citation omitted). Instead, the party opposing summary judgment has a shifting burden and "must -- by affidavits or as otherwise provided in this rule -- set out specific facts showing a genuine issue for trial." *Id*. (citation omitted). Failure "to properly address another party's assertion of fact as required by Rule 56(c)" could result in the Court "consider[ing] the fact undisputed for purposes of the motion." Fed. R. Civ. P. 56(e)(2).

The standard does not change because both parties have filed cross summary judgment motions. "Rather, the court must evaluate each party's motion on its own merits, taking care in each instance to draw all reasonable inferences against the party whose motion is under consideration." *Taft Broad. Co. v. United States*, 929 F.2d 240, 248 (6th Cir. 1991) (quoting *Mingus Constructors, Inc. v. United States*, 812 F.2d 1387, 1391 (Fed. Cir. 1987)). Thus, "[e]ach party… bears the burden of establishing that no genuine issue of material fact exists and that she or [he] is entitled to a judgment as a matter of law." *Klaus v. Hilb, Rogal & Hamilton Co. of Ohio*, 437 F. Supp. 2d 706, 732 (S.D. Ohio 2006).

Finally, "there is no duty imposed upon the trial court to 'search the entire record to establish that it is bereft of a genuine issue of material fact.'" *Buarino v. Brookfield Twp. Trs.*, 980 F.2d 399, 404 (6th Cir. 1992) (citations omitted). Instead, "[i]t is the attorneys, not the judges, who have interviewed the witnesses and handled the physical exhibits; it is the attorneys, not the judges, who have been present at the depositions; and it is the attorneys, not the judges, who have a professional and financial stake in case outcome." *Id*. at 406. In other words, "the free-ranging search for supporting facts is a task for which attorneys in the case are equipped and for which courts generally are not." *Id*.

## II.

Plaintiff, in his motions and replies, presents a statement of facts supported by, *inter alia*, his own affidavit and those of other CCI inmates, depositions of prison officials, and evidence of the communications between himself and various CCI mailroom employees. Defendants' statement of facts is supported by, *inter alia*, the affidavits of Warden Jenkins, Warden Shoop and the CCI librarian, as well as sworn interrogatory responses from Lt. Eiring. The Court has carefully considered all of the evidence submitted by the parties on summary judgment, *see* Fed. R. Civ. P. 56(c)(1)(A), and, unless otherwise stated herein, the following are the undisputed facts of the case.

The policy at issue is Ohio Department of Rehabilitation and Corrections "ODRC" 61-PRP-01 ("the policy"), which prohibited prisoners on death row from receiving personal property packages if they were not ordered from "approved vendors" and "initiated by the inmate." Doc. 67 at PageID 1081. The practical effect of this policy was a ban on "gift publications," *i.e.*, publications ordered by friends or family members through a vendor or publisher and sent to CCI prisoners on death row. *Id.* at PageID 1083. The policy was implemented on February 5, 2015 by Warden Jenkins and Lt. Eiring. *Id.* at PageID 1081.

Per the policy, Defendants withheld four gift publications from Plaintiff between March and June 2015. *Id.* at PageID 1087-90. With respect to each of the four withheld books, the mailroom employees at CCI sent Plaintiff a notice explaining that it was withheld because the "book [was] not ordered by [Plaintiff]." *Id.* The notice provided Plaintiff the option to either mail the books out at his own expense or have the books destroyed. *Id.*

Plaintiff, discontent with either these options, sought to appeal the withholding decision to the "publication review committee." Doc. 67 at PageID 1091. Lt. Eiring informed Plaintiff that such appeals were available only when books were withheld due to the subject matter of the publication, not when books were withheld under the policy as gifts. *Id.* Similar written conversations ensued for all four books withheld by Defendants. *See, e.g., id.* at PageID 1024-25. In response to one of

4

Plaintiff's requests for an appeal, he was instructed by a mailroom employee to "contact the [c]haplain." *Id*. at PageID 1099. Plaintiff eventually learned that, for a time, CCI excepted religious material from the policy and allowed the CCI chaplain to inspect gift publications that were religious in nature before forwarding them to the inmate. *Id*. at PageID 1257.

Plaintiff then filed a grievance and various follow-up Informal Complaint Resolution documents with Lt. Eiring. *Id*. at PageID 1100-01. Ultimately dissatisfied with repeated responses that his books were withheld under the policy because they were not ordered from his account, Plaintiff submitted subsequent grievances seeking to change the policy itself. *Id*. at PageID 1027. When these efforts proved futile, Plaintiff filed this § 1983 action. *Id*. His efforts to access publications at the prison, however, continued. He submitted requests for books, magazines, and publications to the CCI librarian totaling nearly 220 titles,[4] including Seals on the Persepolis Fortification Tablets, The Cave of Fontechevade, and Dermatopathology. Doc. 68 at PageID 1287. Plaintiff did receive a portion, albeit small, of his requested books through various public library book loan programs. Doc. 67 at PageID 1034.

The policy was rescinded on March 1, 2017 by Warden Jenkins and replaced with a policy allowing gift orders, but still requiring all publications to be sent from vendors or publishers only (*i.e.*, a "publisher only" policy). Doc. 67-1 at PageID 1083. In the month after the policy was rescinded, CCI officials found two cell phones smuggled inside publications ordered by a third party but purportedly sent directly from a publisher, *i.e*, a gift publication. Doc 68-4 at PageID 1394. CCI ultimately determined that it was necessary to purchase a $20,957.00 x-ray machine to reduce the resources expended on the physical inspection of incoming packages. *Id*.

---

[4] Plaintiff's $205.00 in damages is based on these titles he requested less the titles he was able to acquire through various library loan programs.

## III.

Section 1983 confers a private federal right of action against any person who, acting under color of state law, deprives an individual of a right, privilege, or immunity secured by the Constitution or federal laws. *Burnett v. Grattan*, 468 U.S. 42, 44 n.3 (1984). Thus, to state a § 1983 claim, a plaintiff must allege "(1) a deprivation of rights secured by the Constitution and laws of the United States and (2) that the deprivation was caused by a person acting under color of state law." *Tahfs v. Proctor*, 316 F.3d 584, 590 (6th Cir. 2003).

By alleging "that [an] official policy is responsible for a deprivation of [his] rights," Plaintiff essentially asserts a *Monell* claim under § 1983. *Monell v. Dep't of Soc. Servs.,* 436 U.S. 658, 690 (1978). To prevail on a *Monell* claim, Plaintiff must show (1) that he suffered a constitutional violation and (2) that an institutional policy or custom directly caused the violation. *Id*. at 690-92. In this instance, Plaintiff claims that the publication seizure in question -- undertaken pursuant to the policy, as to the four seized books in question and the 220 or so requested books, magazines, and newspapers at issue -- violated his rights under the First Amendment (as an impermissible restriction upon his free speech rights) and the Fourteenth Amendment (as a due process violation).[5] For the reasons set forth below, the undersigned finds that Plaintiff's injury does not rise to the level of a First or Fourteenth Amendment violation.

---

[5] Nor are other constitutional provisions at issue here. The book seizure cannot constitute a "taking" under the Fifth or Fourteenth Amendments because the Government did not "actual[ly] take[] possession and control" of the books such that Plaintiff lost "the rights to possess, use[,] and dispose of" them. *See infra* § III.A.2*; Horne v. Dep't of Agric.,* 135 S. Ct. 2419, 2428 (2015) (citing *Loretto v. Teleprompter Manhattan CATV Corp.,* 458 U.S. 419, 435 (1982)). Nor is the prison officials' conduct in relation to the books a "search" or "seizure" within the meaning of the Fourth Amendment. "The exigencies of prison life authorize officials indefinitely to dispossess inmates of their possessions without specific reason, any losses that occur while the property is in official custody are simply not redressable by Fourth Amendment litigation." *Hudson v. Palmer*, 468 U.S. 517, 538 (1984). Additionally, although Plaintiff complains of procedural due process violations under the Fourteenth Amendment, he does not suggest his equal protection rights were violated in this instance; doc. 67 at PageID 1045-53.

## A. First Amendment Claim

Plaintiff first asserts that CCI's policy prohibiting gift publications violated his First Amendment right to receive "information and ideas."  Doc. 67 at PageID 1054-68; *Martin v. City of Struthers*, 319 U.S. 141, 143 (1943) ("Freedom to distribute information to every citizen wherever he desires to receive it is so clearly vital to the preservation of a free society"); *Stanley v. Georgia*, 394 U.S. 557, 564 (1969) ("It is now well established that the Constitution protects the right to receive information and ideas").  While prisoners retain First Amendment rights while incarcerated, they possess only "those First Amendment rights . . . 'not inconsistent with [their] status as . . . prisoner[s] or with the legitimate penological objectives of the corrections system.'"  *Hudson v. Palmer*, 468 U.S. 517, 523 (1984) (*quoting Pell v. Procunier*, 417 U.S. 817, 822 (1974)).

"When a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests."  *Turner v. Safley*, 482 U.S. 78, 89 (1987). In *Turner*, the Supreme Court identified four factors relevant to determining the reasonableness of a challenged prison regulation:

1.    there must be a valid, rational connection between the prison regulation and the legitimate governmental interest put forward to justify it;

2.    there must be alternative means of exercising the right that remain open to prison inmates;

3.    we must consider the impact that accommodation of the asserted constitutional right will have on guards and other inmates and on the allocation of prison resources generally; and

4.    there must not be alternatives available that fully accommodate the prisoner's rights at *de minimis* cost to valid penological interests.

*Id.* at 89-92.  The *Turner* factors balance the two competing interests at stake in these cases.  On one hand, "federal courts must take cognizance of the valid constitutional claims of prison inmates."  *Id.* at 84.  Yet, courts must also recognize that they are "ill equipped to deal with the increasingly urgent problems of prison administration and reform."  *Id.* (internal citations omitted).  The four *Turner* factors need not be weighed evenly but are, instead, guidelines for the court to assess whether the

prison officials' actions are reasonably related to a valid penological interest. *See Whitney v. Brown*, 882 F.2d 1068, 1076 (6th Cir. 1989).

### 1. First *Turner* Factor

*Turner* first instructs courts to apply a reasonableness standard in determining whether there is a "valid, rational connection between the prison regulation and the legitimate governmental interest put forward to justify it." *Turner*, 482 U.S. at 89. The objective advanced by the government must be both neutral and legitimate, and the policy must not be so attenuated from the objective so as to render it "arbitrary or irrational." *Id.* The prisoner bears the burden of disproving the validity of the prison regulation. *See Overton v. Bazzetta*, 539 U.S. 126, 132 (2003). If the prisoner prevails on this first factor, the policy is unconstitutional and the court need not consider the remaining three *Turner* factors. *Spies v. Voinovich*, 173 F.3d 398, 403 (6th Cir. 1999).

Prison policies regulating prisoner access to printed materials frequently come under scrutiny. "Publisher only" policies – *i.e.,* policies requiring all publications received by a prisoner to be sent from an approved publisher or vendor -- are routinely upheld as constitutional. *See e.g., Bell v. Wolfish*, 441 U.S. 520 (1969) (holding a "publishers only rule" rule for receiving hard cover books consistent with the First Amendment); *Ward v. Washtenaw County Sheriff's Dep't.*, 881 F.2d 325, 330 (6th Cir. 1989) (extending the "publishers only rule" to soft cover books under *Turner*); *Thompson v. Campbell*, 81 F. App'x 563 (6th Cir. 2003) (upholding a policy that "prohibits inmates from receiving books, magazines, and newspapers from sources other than their publisher," consistent with *Ward* and *Bell*). Publisher only policies are upheld as "necessary to control the security problems caused when contraband such as drugs and weapons are smuggled in various books, magazines, and newspapers to inmates from unidentified sources or visitors." *Ward,* 881 F.2d at 329.

Courts, however, have invalidated prison policies that are more restrictive than the publisher only policy. *See e.g., Ashker v. Cal. Dep't of Corr.*, 350 F.3d 917, 922-24 (9th Cir. 2003) (finding unconstitutional a policy imposing labeling requirements on books in addition to a publisher only rule).

Such is true especially where the justification for the policy is unsupported by specific facts in the record. *See Crofton v. Roe*, 170 F.3d 957, 960-61 (9th Cir. 1999) (finding a policy prohibiting gift-publications unconstitutional because the state "offered no justification for a blanket ban on the receipt of all gift publications, nor has it described any particular risk created by prisoners receiving such publications"); *Lindell v. O'Donnell*, 211 F. App'x 472, 476 (7th Cir. 2006) (recognizing that an all-out ban on receiving printed internet materials, including from friends and family members, would be unconstitutional, but finding defendants entitled to qualified immunity).

Here, Defendants assert that the policy was implemented to eliminate security threats posed by contraband clandestinely transferred into the prison through gift publications. Doc. 68 at PageID 1292-93. In support of this justification, Warden Shoop explains that: [6]

> The problem with third-party book orders from unapproved vendors is that after a book is purchased, contraband can be secreted in the binding and/or between pages. The book can then be shrink-wrapped and/or repackaged by a third party to look like it is coming directly from a publisher or distributor. Once packaged, the book can be shipped to the inmate by a third party using a label made to appear as though it is actually being shipped by a publisher or distributor…. Only last month [July 2017] CCI mailroom staff uncovered two cell phones concealed in two books shipped to inmates purportedly from Barnes and Noble . . . . [U]nless an inmate has ordered the book through his inmate account, there are no tracking numbers for the facility to use to verify that the book was actually shipped from a publisher or a distributor.

Doc 68 at PageID 1287.[7]

---

[6] In reversing the Court's previous Rule 12(b) dismissal of Plaintiff's First Amendment claim, the Sixth Circuit found, at that time, that "[D]efendants [did] not explain how a third party ordering printed materials directly from an approved vendor versus an inmate doing so creates the risk of hidden contraband." *Bethel*, 2017 U.S. App. Lexis 22061 at *5. On summary judgment, Defendants present Rule 56 evidence for the Court's consideration on this point. Doc 68 at PageID 1287.

[7] The role of motivation in the first *Turner* inquiry has caused consternation across jurisdictions and has resulted in a split among authority on whether a prison policy may be *post hoc* justified. *Compare Hammer v. Ashcroft*, 570 F.3d 798, 803 (7th Cir. 2009) ("It is not clear why one bad motive would spoil a rule that is adequately supported by good reasons. The Supreme Court did not search for 'pretext' in *Turner*; it asked instead whether a rule is rationally related to a legitimate goal") *with Quinn v. Nix*, 983 F.2d 115, 118 (8th Cir. 1993) ("Prison officials are not entitled to the deference described in *Turner* ... if their actions are not actually motivated by legitimate penological interests at the time they act"). The Sixth Circuit has not decided the issue, but in consideration of the deference owed to prison officials in the administration of prison security and the objective language of *Turner*, the undersigned agrees with the Seventh Circuit and considers Defendants' justification.

The undersigned initially finds that the policy is neutral and the justification is legitimate both facially and as applied to Plaintiff. The policy concerns the manner in which publications can be ordered, not to the content of the materials. *See Turner*, 482 U.S at 90 (finding it "important to inquire whether prison regulations restricting inmates First Amendment rights operate in a neutral fashion without regard to the content of the expression"). Moreover, the policy itself explicitly stated that its central goal was to eliminate the security threat posed by contraband entering the prison through gift publications. Doc. 69 at PageID 1408; *Thornburgh,* 490 U.S. at 413 (finding the protection of prison security is "central to all other corrections goals" and recognizing that "[i]ncoming mail poses a particularly high threat to prison safety and security").

Plaintiff, however, presents arguments challenging whether the policy is "reasonably related to legitimate penological interests, and [is] not an exaggerated response to such objectives." *Beard v. Banks*, 548 U.S. 521, 528 (2006) (plurality op. of Breyer, J.). Specifically, Plaintiff argues that the reasonable relationship standard cannot be satisfied here because, in practice, CCI does not actually check tracking numbers to verify that books are truly shipped from a publisher or a distributor. Doc. 71 at PageID 1458-60. In support of this argument, Plaintiff points to a written message sent from a mailroom employee at CCI to an inmate, stating "there is no way for us to track anything."[8] Doc. 75[9] at PageID 1633. Plaintiff also points to evidence that the policy was seemingly disregarded to allow the receipt of religious books sent to prisoners from third parties (PageID 1059-60) and, thus, was applied in an arbitrary and inconsistent manner. *Crofton v. Ocanaz*, No. 2:95-cy-03142-LRS, 1996

---

[8] In response to another inmate's request for his package to be tracked, a CCI prison official responded that there was no way to track the package, unless the inmate paid to send it certified. Doc. 75. The Court notes that while Defendants did not object to this evidence as hearsay, it would be admissible under the statement of a party-opponent and statement of an employee or agent of party-opponent hearsay exception, under the Federal Rules of Evidence 801(d)(2)(A) and Rule 801(d)(2)(D). *See Geleta v. Gray*, 645 F.3d 408, 414-15 (D.C. Cir. 2011) (considering statements at summary judgment because the plaintiff "filed suit against the mayor of D.C. in his official capacity, [thus] the District is a party to the suit and statements by District employees concerning matters within the scope of their employment are admissible against the District[.] The statements therefore fall within Rule 801(d)(2)(D).").

[9] The Court, for good cause shown, **GRANTS** Plaintiff's motion to have the Court consider evidence attached to his summary judgment reply memorandum. Doc. 75.

U.S. Dist. Lexis 22770, at *26 (E.D. Wash. Dec. 17, 1996) (doubting the connection between a policy and a security concern where "defendants delivering of the book demonstrates the arbitrary nature of this particular regulation"); *see also Jacklovich v. Simmons*, 392 F.3d 420, 430 (10th Cir. 2004) (remanding the case, in part, to determine the nature and extent of a no-gift policy where inconsistent application of the gift publication ban was suggested).

Defendants, on the other hand, point to evidence that two pieces of contraband were found in the month CCI began inspecting gift publications after rescinding the policy in March 2017. Doc. 68-4 at PageID 1394. This undisputed evidence is sufficient to demonstrate a reasonable relationship between the policy and the proffered security interest. *Accord Thornburgh*, 490 U.S. at 417 (clarifying that Defendants need not prove that the prohibited materials caused or are even "likely" to cause security breaches, but only that a rational prison official believes the policy could advance a legitimate penological interest). It also distinguishes this case from those where prison officials failed to develop a record supporting the connection between the policy and the security interest. *C.f. Crofton v. Roe*, 170 F.3d 957, 960 (9th Cir.), *as amended* (May 5, 1999) ("Here, although the state has had ample opportunity to develop a record, it has offered no justification for a blanket ban on the receipt of all gift publications, nor has it described any particular risk created by prisoners receiving such publications"). Accordingly, based on this undisputed evidence, the undersigned cannot conclude the policy banning gift publications was an exaggerated response to the actualized threat that third-parties may seek to smuggle contraband in publications sent to inmates from publishers. *Thornburgh*, 490 U.S. at 407-08. Thus, even accepting Plaintiff's factual assertions as true, the first *Turner* factor favors Defendants.

### 2. Second, Third, and Fourth *Turner* Factors

The second, third, and fourth *Turner* factors are balanced together. *Flagner v. Wilkinson*, 241 F.3d 475, 484 (6th Cir. 2001). The second *Turner* factor asks whether "alternative means of exercising the right . . . remain open to the prison inmate." 482 U.S. at 90. The "right" must be viewed both

"sensibly and expansively." *Thornburgh*, 490 U.S. at 417. Although Plaintiff demands unfettered access to any book he desires, to satisfy this element, the policy need only provide the right to "receive and read a broad range of publications." *Thornburgh*, 490 U.S. at 418.

Here, sufficient alternate means exist. Plaintiff admits that, prior to the "commencement of this action[,] . . . [he] could have used his state pay to purchase publications" to the extent he now desires.[10] Doc. 67 at PageID 1062. Further, while family and friends were not permitted to directly order and send publications to him, they could fund his account or send him subscription cards enabling him to directly order publications himself. *Id.*; *see also* doc. 69 at PageID 1408. Moreover, the CCI library, the Inter Library Loan program, and the Serving Every Ohioan ("SEO") Library provided Plaintiff access to a broad range of materials -- *i.e.*, eight million books in 93 different Ohio library systems. *Id*; doc. 68 at PageID 1288. Based on these facts, the second *Turner* factor strongly weighs in Defendants' favor.[11] *Wardell v. Maggard*, 470 F.3d 954, 961 (10th Cir. 2006) (finding that "the alternatives need not be ideal[;] they need only be available") (internal citations omitted); *Kines v. Day*, 754 F.2d 28, 30 (1st Cir. 1985) (finding sufficient alternatives where "[i]n addition to having an institutional library . . . inmates [had] available a procedure for requesting books from other libraries").

---

[10] Plaintiff earns a salary of $16 a month at CCI and amassed $375.00 while the policy was in place, providing him sufficient funds to purchase a number of the publications he desired. Doc. 73 at PageID 1612.

[11] Plaintiff does not specifically raise an "as-applied" challenge to the policy. Assuming, *arguendo*, such argument was raised, it would fail. While there may be some dispute regarding the accessibility of publications through the various CCI library programs (doc. 67 PageID 1063-64), the undisputed facts (*see* doc. 67 at PageID 1062-64; doc. 71 at PageID 1471, 1473) sufficiently show that Plaintiff had access to a broad range of materials. *See Flagner v. Wilkinson*, 241 F.3d 475 (6th Cir. 2001) (*citing O'Lone v. Estate of Shabazz*, 482 U.S. 342 (1987)) (acknowledging the validity of an "as-applied" First Amendment challenge to a prison policy, but refusing to grant remand for fact finding on one of the *Turner* factors, for fear that it would encourage the "type of 'unnecessary intrusion of the judiciary' into 'problems of prison administration' that *O'Lone* warned against"). This case is distinguishable from those cited by Plaintiff because, first, the CCI library is just one of many alternatives available to Plaintiff allowing him access to various books. Second, Plaintiff had an alternate and available mean to acquire the books that were withheld from him -- purchasing the books from his account with money used to pursue this lawsuit. *Cf. Prison Legal News, Inc. v. Werholtz*, No. 02-4054-MLB, 2007 U.S. Dist. Lexis 73629, at *18-19 (D. Kan. Oct. 1, 2007) (finding insufficient alternatives where defendants proffered the prison library as the only alternative); *Prison Legal Calhoun v. Corr. Corp of Am.*, No. 09-683 (MJD/JSM), 2010 U.S. Dist. Lexis 102067, at *44 (D. Minn. July 16, 2010) (finding insufficient alternatives because there were no alternative means to acquire the three specific publications withheld from prisoner).

The third *Turner* factor requires analysis of the impact caused to others, including prison officials, employees, and other inmates, should they permit receipt of gift publications. 482 U.S. at 90; *Thornburgh*, 490 U.S. at 418. The undisputed evidence shows that allowing gift publications creates a "tremendous influx of incoming mail needing to be carefully examined for contraband." Doc. 68 at PageID 1394. Defendants diverted prison resources towards the effort of sorting gift orders, causing delays in the processing of regular mail and requiring prison officials to forego the purchase of other needed prison resources. *Id*. Further, the absence of the policy resulted in actual instances of secreted contraband. *Id*. Again, even resolving all contested facts most favorably to Plaintiff, the facts demonstrate that accommodating Plaintiff's claimed right, by allowing the receipt of gift publications, required the allocation of significant resources -- certainly more than a *de minimis* cost. Doc. 67 at PageID 1066; *Turner,* 482 U.S. at 90 ("When accommodation of an asserted right will have a significant ripple effect on fellow inmates or on prison staff, courts should be particularly deferential to the informed discretion of corrections officials").

Finally, if an inmate can identify an alternative that fully accommodates his or her rights at a *de minimis* cost to valid penological interests, courts may consider that alternative as evidence that the policy does not satisfy the reasonable relationship standard. *Turner*, 482 U.S. at 90-91. As an alternative to the policy, Plaintiff suggests publishers send CCI confirmation emails that include tracking information after a gift publication is ordered. [12] Doc. 67 at PageID 1067-68. As a preliminary matter, it is not the Court's role to draft prison policies; instead, the Court is limited to reviewing

_____

[12] Plaintiff offers two additional alternatives to the policy in question, neither of which are meritorious. First, physically screening all gift publications was ultimately accepted by Defendants, but it did not come at a *de minimis* cost. Rather, the increased volume of packages needing screening prompted Defendants to purchase a $20,000 x-ray machine. Doc. 68 at PageID 1394; *see Amatel v. Reno*, 156 F.3d 192, 201 (D.C. Cir. 1998) (finding the costs of an approach "far from *de minimis*" where [t]he most obvious alternative is a detailed…publication-by-publication…sifting to determine whether a particular publication will harm the rehabilitation of a particular prisoner"). Plaintiff's second suggestion, limiting the number of gift publications a prisoner is permitted to receive, would alleviate the administrative burden, but would not fully accommodate Plaintiff's proffered right to receive all non-threatening publications. Some of the over 200 books Plaintiff was allegedly prevented from receiving under the policy would likely have also been withheld under volume control measures, placing Plaintiff back in the same scenario that led him to file this lawsuit.

13

existing prison policies to determine whether or not, in a particular case or controversy, such a policy passes constitutional muster. *Duamutef v. Leonardo*, No. 9-cv-1100, 1993 U.S. Dist. Lexis 14913, at *11 (N.D.N.Y. Oct. 22, 1993); *Couch v. Jabe*, 737 F. Supp. 2d 561, 573-74 (W.D.Va. 2010). With respect to Plaintiff's proposed policy, Defendants protest that this alternative would cause more than a *de minimis* cost to security interests because, "just like fraudulent labels and packaging, fraudulent email addresses are easily obtained," which can ostensibly be employed to deceive prison officials about the true source of the package. Doc. 69 at PageID 1409. Prison officials "should be accorded wide-ranging deference" where, as here, they are involved in "the adoption and execution of policies and practices that in [the] judgment [of prison officials] are needed to … maintain institutional security." *Flagner*, 241 F.3d at 481 (*citing Wolfish*, 441 U.S. 520). Moreover, the *Turner* standard is not a "least restrictive alternative" test requiring prison officials "to set up and then shoot down every conceivable alternative method of accommodating the claimant's constitutional complaint." *Id.* at 484. Thus, the fourth factor does not weigh in favor of Plaintiff.

Finding the balance of the *Turner* factors favorable to Defendants, summary judgment should be granted to Defendants as to Plaintiff's First Amendment claim.

## B. Due Process Claim

Plaintiff also alleges that Defendants' policy prohibiting gift publications violated his Fourteenth Amendment procedural due process rights.[13] Procedural due process claims are analyzed in two steps: (1) "whether a protected property or liberty interest exists[;]" and, if so, (2) "what

---

[13] While Plaintiff does not allege a substantive due process claim, such a claim would nevertheless fail. The Supreme Court identified three *Turner* factors that are relevant to determining whether the due process rights of a prisoner had been violated: (1) the presence of a valid, rational connection between the prison regulation and the legitimate governmental interest purportedly advanced by that regulation; (2) the impact which accommodation of the asserted constitutional right will have on guards, inmates, and prison resources; and (3) the absence of ready alternatives. *Washington v. Harper*, 494 U.S. 210, 224-25 (1990). Based on the previous First Amendment analysis of these factors, therefore, a substantive due process claim has no merit. *See supra* § III.A.1.

procedures are required to protect that interest." *Johnston-Taylor v. Gannon*, 907 F.2d 1577, 1581 (6th Cir. 1990); *see also Bd. of Regents of State Colls. v. Roth*, 408 U.S. 564, 571 (1972).

In identifying whether a protectable interest exists, the Supreme Court holds that property and liberty interests "are not created by the Constitution." *Roth*, 408 U.S. at 577. Rather, Plaintiff must identify an "*independent source, such as state law,*" that secures certain benefits and that support claims of entitlement to those benefits. *Id.* (emphasis in original). Plaintiff maintains that Ohio Rev. Code § 1520.425 and Ohio Admin. Code § 1520-9-19 create a federally protected property interest in receiving any and all "non-threatening publications." Doc. 67 at PageID 1045.

To determine whether these provisions create a federally protected property or liberty interest, this Court follows the approach enunciated in *Sandin v. Conner*, 515 U.S. 472, 482 (1995). There, the Supreme Court instructed:

> [W]e recognize that States may under certain circumstances create liberty interests which are protected by the Due Process Clause. But these interests will be generally limited to freedom from restraint which, while not exceeding the sentence in such an unexpected manner as to give rise to protection by the Due Process Clause of its own force, nonetheless imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life.

*Id*. at 483-84. (internal citations omitted).[14]  In adopting this standard, the Supreme Court endeavored to shift the focus away from the language of the regulation, and towards the nature of the deprivation. *See Beverati v. Smith*, 120 F.3d 500, 503 n.3 (4th Cir. 1997).  The Supreme Court also sought to discourage "the involvement of federal courts in the day-to-day management of prisons."  *Sandin*, 515 U.S. at 482.  The dispositive inquires, then, are whether (1) the policy at issue imposes a restraint that "exceed[ed] the sentence in such an unexpected manner as to give rise to protection by the Due Process clause of its own force"; or (2) whether Plaintiff suffered a deprivation that imposed an "atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life."  *Id*.  Both inquiries weigh in favor of Defendants.

Though prisoners do not shed all constitutional rights at the prison gate, *Wolff*, 418 U.S. at 555, "lawful incarceration brings about the necessary withdrawal or limitation of many privileges and rights, a retraction justified by the considerations underlying our penal system."  *Price v. Johnston*, 334 U.S. 266, 285 (1948).  Limiting the ways in which a prisoner may receive publications falls within this purview. *See e.g., Bell,* 441 U.S. at 545-46.  As set forth *supra*, Plaintiff had alternative means of acquiring publications, had access to similar books, and could purchase books through his own prisoner

---

[14] While the Sixth Circuit has not explicitly ruled on the circuit split of whether *Sandin* applies to both property and liberty interests, "in several unpublished decisions, [the Sixth Circuit], citing *Sandin*, held that the plaintiff prisoner had 'no *property* interest in his prison job created under state law and protected by due process.'" *Clarkston v. Powers*, 234 F.3d 1267 (6th Cir. 2000); *Perry v. Rose*, 205 F.3d 1341 (6th Cir. 2000); *see also Izard v. Blair*, 173 F.3d 429 (6th Cir. 1999) (citing *Bulger* for proposition that a prisoner has no constitutionally protected right to a job or wage, and noting that BOP regulations did not create a liberty interest, citing *Sandin*)." *Pickelhaupt v. Jackson*, 364 Fed. Appx. 221, 223-26 (6th Cir. 2010) (*cert. denied by Pickelhaupt v. Jackson*, 2010 U.S. Lexis 7008 (U.S., Oct. 4, 2010)) (emphasis added).  This Court also finds convincing the rationale espoused by the Tenth Circuit:

[W]e do not see how the Supreme Court could have made clearer its intent to reject the *Hewitt* analysis outright in the prison context. Indeed, if we are to avoid *Hewitt's* "two undesirable effects" ((1) creating disincentives for states to codify prison management procedures and (2) entangling the federal courts in the day-to-day management of prisons) in the context of prison property interests and return the focus of our due process inquiry from "the language of a particular regulation" to "the nature of the deprivation" as *Sandin* mandates, we must conclude that the Supreme Court foreclosed the possibility of applying the *Hewitt* methodology to derive protected property interests in the prison conditions setting.

*Cosco v. Uphoff*, 195 F.3d 1221, 1223 (10th Cir. 1999) (internal citations omitted).

account. Far from imposing an "a major disruption" in Plaintiff's life, the deprivation here is more appropriately characterized as an inconvenience. *Sandin,* 515 U.S. at 486. In fact, this standard was adopted for the explicit purpose of discouraging these types of prisoner lawsuits alleging violations based on "fine-tuning of the ordinary incident of prison life," which had become common under the standard Plaintiff relies on. Doc. 67 at PageID 1045; *Id.* at 483. The undersigned therefore finds that neither Ohio provision creates a federally protectable interest in receiving any and all publications that do not pose a threat to prison security.

However, even assuming, *arguendo,* that Plaintiff had a protectable property or liberty interest, his claim nevertheless fails because he received sufficient due process. "[I]f protected interests are implicated, we must then decide what procedures constitute due process of law." *Ingraham v. Wright,* 430 U.S. 651, 672 (1977). Specifically, the Court must inquire whether the "withholding delivery of [inmate mail]" was "accompanied by minimum procedural safeguards." *Procunier v. Martinez,* 416 U.S. 396, 417-18 (1974), *overruled on other grounds by Thornburgh v. Abbott,* 490 U.S. 401, 413-14 (1989). Here, Plaintiff had adequate post-deprivation remedies in that he: (1) received written notice explaining why his publications were withheld; (2) was able to seek relief through the prison grievance procedure; and (3) had the option to either have the book destroyed or sent back to the third party who gifted it. *See supra*; s*ee also Johnson v. Hunter,* No. 92-1373, 1992 U.S. App. Lexis 34743, at \*2-4 (6th Cir. Dec. 21, 1992) (dismissing due process claim alleging "certain infirmities in the grievance hearing process, in regard to the rejection of the books"); *Frost v. Symington,* 197 F.3d 348, 353 (9th Cir. 1999) (finding an inmate "has a Fourteenth Amendment due process liberty interest in receiving notice that his incoming mail is being withheld by prison authorities"); *Rector v. Caruso,* No. 1:10-cv-904, 2011 U.S. Dist. Lexis 11193, at \*18-21 (W.D. Mich. Jan. 3, 2011) (finding due process satisfied where Plaintiff did not receive a post-deprivation hearing but was able to seek relief through the three-step grievance procedure and had the option to preserve the book by sending it out of the prison).

Therefore, Defendants are also entitled to summary judgment on Plaintiff's Fourteenth Amendment due process claim.

## C. Qualified Immunity

Notwithstanding the analysis above, Defendants are also entitled to qualified immunity in their individual capacities. State officials who perform discretionary functions have qualified immunity from individual liability for damages arising from the exercise of those functions. *Black v. Parke*, 4 F.3d 442, 445-46 (6th Cir. 1993). "Qualified immunity shields individual government officials from liability 'insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Hensley v. Gassman*, 693 F.3d 681, 687 (6th Cir. 2012) (*citing Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).

Where a defendant moves for summary judgment based on qualified immunity grounds, the initial burden is on the defendant to come forward with sufficient facts to suggest that they acted within the scope of their discretionary authority.[15] *Rich v. City of Mayfield Heights*, 955 F.2d 1092, 1095 (6th Cir. 1992). Thereafter, and, ultimately, the burden is on the Plaintiff to prove that: (1) the defendant violated a constitutional right; and (2) that right was clearly established. *Id.; Saucier v. Katz*, 533 U.S. 194, 201 (2001). Once disputed factual issues are resolved, the application of qualified immunity to the facts is a question of law for the court to decide. *Greene v. Reeves*, 80 F.3d 1101, 1104 (6th Cir. 1996). The judges of the district courts are "permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Pearson v. Callahan*, 555 U.S. 223, 236 (2009).

---

[15]Plaintiff argues that Defendants cannot claim qualified immunity because their acts were ministerial. However, "[t]his traditional view has been eroded in recent years by a trend away from the discretionary/ministerial dichotomy." *Putnam v. Davies*, 169 F.R.D. 89, 96 (S.D. Ohio 1996). The Supreme Court has "been unwilling to complicate qualified immunity analysis by making the scope or extent of immunity turn on the precise nature of various officials' duties[.]" *Anderson v. Creighton*, 483 U.S. 635, 643, (1987). Nevertheless, Defendants proffer sufficient evidence to suggest that they acted reasonably and within the scope of their authority in enacting the policy to exclude gift orders.

As found by the undersigned above, Plaintiff fails to demonstrate that his First or Fourteenth Amendment rights were violated. This ends the court's qualified immunity analysis. Instead, in this regard, Plaintiff suggests that, because Defendants violated various Ohio statutory or administrative code provisions, they are not entitled to claim qualified immunity. Doc. 67 at PageID 1069. However, state statutes and regulations do not create federal constitutional rights. *Danese v. Asman*, 875 F.2d 1239, 1245 at n.5 (6th Cir. 1989) *(citing Davis v. Scherer*, 468 U.S. 183, 194 (1984)) (reversing district court's holding that the underlying state law violation of a procedural due process claim caused defendants to lose their qualified immunity). Thus, even assuming that the policy violated Ohio law, such a violation would not cause the offending officials to lose qualified immunity under federal law. *Id.*

Nor did Plaintiff satisfy his burden of showing a clearly established right at the second step. Neither the Supreme Court nor the Sixth Circuit has ruled specifically on a gift publication ban, but both higher courts have consistently upheld publisher only policies. *See e.g. Bell*, 441 U.S. at 520; *Ward*, 881 F.2d at 325; *Thompson v. Campbell*, 81 F.App'x. 563, 569 (6th Cir. 2003). But a clearly established law validating publisher only policies under the First Amendment does not, as Plaintiff suggests, put reasonable officials in Defendants' position on notice that a policy banning gift orders may violate the First or Fourteenth Amendment. *Jihaad v. O'Brien*, 645 F.2d 556, 562 (6th Cir. 1981) (emphasizing the difference between general constitutional rights and the "particular right which plaintiff sought to exercise"). Therefore, Defendants are entitled to qualified immunity in their individual capacities.

**IV.**

In light of the foregoing, *pro se* Plaintiff's two motions -- to file an amended complaint (doc. 70) and supplement the summary judgment record (doc. 75) are both **GRANTED** for good cause shown. Additionally, the undersigned **RECOMMENDS** that (1) Defendants' motion for summary judgment (doc. 68) be **GRANTED**; (2) *pro se* Plaintiff's cross summary judgment motion (doc. 67)

19

be **DENIED**; and (3) this case be **TERMINATED** on the Court's docket. The Clerk shall mail a copy of this Report and Recommendation to *pro se* Plaintiff at his CCI address.


Date:  February 25, 2019                    s/ Michael J. Newman
                                            Michael J. Newman
                                            United States Magistrate Judge

## NOTICE REGARDING OBJECTIONS

Pursuant to Fed. R. Civ. P. 72(b), any party may serve and file specific, written objections to the proposed findings and recommendations within **FOURTEEN** days after being served with this Report and Recommendation.  This period is not extended by virtue of Fed. R. Civ. P. 6(d) if served on you by electronic means, such as via the Court's CM/ECF filing system.  If, however, this Report and Recommendation was served upon you by mail, this deadline is extended to **SEVENTEEN DAYS** by application of Fed. R. Civ. P. 6(d).  Parties may seek an extension of the deadline to file objections by filing a motion for extension, which the Court may grant upon a showing of good cause.

Any objections filed shall specify the portions of the Report and Recommendation objected to and shall be accompanied by a memorandum of law in support of the objections.  If the Report and Recommendation is based, in whole or in part, upon matters occurring of record at an oral hearing, the objecting party shall promptly arrange for the transcription of the record, or such portions of it as all parties may agree upon or the Magistrate Judge deems sufficient, unless the assigned District Judge otherwise directs.

A party may respond to another party's objections within **FOURTEEN** days after being served with a copy thereof.  As noted above, this period is not extended by virtue of Fed. R. Civ. P. 6(d) if served on you by electronic means, such as via the Court's CM/ECF filing system.  If, however, this Report and Recommendation was served upon you by mail, this deadline is extended to **SEVENTEEN DAYS** by application of Fed. R. Civ. P. 6(d).

Failure to make objections in accordance with this procedure may forfeit rights on appeal. *See Thomas v. Arn,* 474 U.S. 140, 153-55 (1985); *United States v. Walters*, 638 F.2d 947, 949-50 (6th Cir. 1981).